715 S.E.2d 348

**REGIONS BANK, Appellant,**

v.

**WINGARD PROPERTIES, INC., James T. Wingard, III, Deborah G. Wingard, Klassic Kitchen Design, Inc., Coastal Closets, LLC, Dean Pappas, and Best–Way Insulation of Fairmont, Inc., Defendants,**

v.

**Ray Covington, Intervenor, Respondent.**

No. 4846.

Court of Appeals of South Carolina.

Submitted April 1, 2011.

Decided June 22, 2011.

242

244

246

Demetri K. Koutrakos, Stanley H. McGuffin, Louise M. Johnson, and Lindsey Carlberg Livingston, all of Columbia, for Appellant.

Daryl G. Hawkins and Charles E. Usry, both of Columbia, for Respondent.

PIEPER, J.

This appeal arises out of a nonjury trial resulting in an order awarding Respondent Ray Covington a first priority equitable lien superior to the mortgage of Appellant Regions Bank. On appeal, Regions Bank argues it should have priority because Covington's deposit check on his contract with Wingard Properties, Inc. (Wingard) was not cashed prior to the recording of Regions Bank's mortgage. We affirm.[1]

## FACTS

Regions Bank filed a complaint in the circuit court, seeking foreclosure of three different mortgages with Wingard.[2] As collateral for a $7,000,000 revolving construction loan, Wingard mortgaged Lot 38 at the Village at Grande Dunes in Myrtle Beach to Regions Bank on November 9, 2006. Regions Bank recorded its mortgage on Lot 38 in the Horry County Register of Deeds on November 13, 2006.

Prior to Wingard's mortgage with Regions Bank, Covington entered into a residential home purchase agreement with Wingard for the sale of Lot 38 on September 12, 2006. Covington wrote a check to Wingard for $276,700 on October 20, 2006, as a down payment according to the terms of the purchase agreement. Wingard did not deposit this check in its bank account until November 14, 2006, the day after Regions Bank recorded its mortgage. Covington also wrote a $10,000 check to Grande Dunes Properties on September 3, 2006, which cleared the drawee bank on September 15, 2006. Regions Bank conceded at trial that Covington has an equitable lien with priority over its mortgage as to this $10,000.

Regions Bank required Wingard to sell the unit for each lot as a precondition for the construction loan. According to testimony from Regions Bank employee Stephanie Gates, the bank was aware of the sales contract with Covington before it advanced any funds to Wingard under the construction loan. Further, Regions Bank required Wingard to produce evidence that Covington was qualified to purchase the home. In an

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. Wingard is not a party to the appeal.

undisputed ruling, the trial court found Regions Bank admitted it would not have made the loan without Covington's purchase agreement and $286,700 deposit.

Regions Bank disputes the findings of fact by the trial court concerning the lag between Wingard's receipt of Covington's deposit check on October 20th and deposit of the check on November 14th. Tom Wingard testified he did not recall that Covington's check was not deposited until November 14, 2006, until he reviewed documentation later. Covington testified that he met with Bobby Roberson at BB & T, who represented to him that BB & T would cover the down payment on Lot 38. Covington believed at the time he presented the check to Wingard that the check would be good. Regions Bank presented Covington's bank records from Bank of America, which showed that the account was not adequately funded until November 14, 2006. Covington wrote the check from his Bank of America account, although BB & T was the bank Covington chose to finance his loan.

Regions Bank also disputes that it had full knowledge of the terms of the purchase agreement between Wingard and Covington. Finally, Regions Bank disputes the trial court's finding that the failure to grant Covington a first priority equitable lien would result in a forfeiture. Ultimately, the court found that Covington was entitled to a $286,700 first priority equitable lien superior to Regions Bank's mortgage on Lot 38. Regions Bank filed a motion to alter or amend pursuant to Rule 59(e), SCRCP. The court denied the motion in a written order following a hearing. This appeal followed.

## STANDARD OF REVIEW

A mortgage foreclosure is an action in equity. *Hayne Fed. Credit Union v. Bailey*, 327 S.C. 242, 248, 489 S.E.2d 472, 475 (1997). We review factual findings and legal conclusions in an equitable action de novo. *Lewis v. Lewis*, 392 S.C. 381, 388–89, 709 S.E.2d 650, 653–54 (2011). However, this de novo review does not require an appellate court to disregard the findings of the trial court or to ignore the fact that the trial court is in the better position to assess the credibility of the witnesses. *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). Moreover, the appellant

is not relieved of the burden of convincing the appellate court that the trial court committed error in its findings. *Id.* at 387–88, 544 S.E.2d at 623. Consequently, we will affirm the findings of the trial court in an equity case unless the appellant satisfies this court that the preponderance of the evidence is against the findings of the trial court. *Lewis* at 388–89, 709 S.E.2d at 653–54.

## ANALYSIS

■ Equitable maxims are not binding legal precedent but represent notions and concepts of equity in various situations. *See* Russell L. Weaver, et al., *Principles of Remedies Law* 8 (2007) ("[Equity courts] . . . began to develop 'rules' or 'maxims' governing equitable relief. Although these 'maxims' were generalizations of experience based on the results of prior cases, they eventually developed into a loose set of 'rules' designed to bring some coherency to the body of decided cases and some consistency to future decisions."). Maxims developed, at least in part, to reflect the attempt by the courts of equity to create guiding principles, in the same way that the legal courts developed binding precedent. *See, e.g., Swetland v. Curtiss Airports Corp.*, 41 F.2d 929, 936 (D.Ohio 1930) ("Maxims are but attempted general statements of rules of law. The judicial process is the continuous effort on the part of the courts to state accurately these general rules, with their proper and necessary limitations and exceptions."). "Even today, it is not unusual to find judges citing and applying these ancient maxims (much like modern courts use cases as precedent) in deciding whether or not to grant equitable relief." Russell L. Weaver, et al., *Remedies: Cases, Practical Problems, & Exercises* 10 (2004). Thus, we view maxims only as offers of guidance in equitable cases. *See, e.g., Brown v. Plata,* —— U.S. ——, 131 S.Ct. 1910, 1944, 179 L.Ed.2d 969 (2011) (discussing courts' substantial flexibility when deciding cases in equity, stating "[o]nce invoked, the scope of a district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies.") (internal citation and quotation marks omitted).

In deciding whether a party is entitled to a first priority equitable lien, courts are confronted with the interplay between equitable maxims and principles. This case involves the

consideration and balancing of several equitable maxims: equity regards as done that which ought to have been done; equity applies substance over form; equity abhors a forfeiture; equity follows the law; and one who seeks equity must do equity. The trial court reviewed substance over form in determining what ought to be done in this case by awarding Covington priority over Regions Bank's mortgage because the bank had knowledge of Covington's interest in Lot 38 before it recorded its mortgage.

On the other hand, Regions Bank argues Covington should not be allowed to claim an equitable lien superior to its own mortgage, even though Covington tendered a check prior to the date Regions Bank recorded its mortgage, because Covington knew that his account did not contain sufficient funds. Regions Bank asks the court to distinguish Covington's claim from the facts in *South Carolina Federal Savings Bank v. San–A–Bel Corporation,* 307 S.C. 76, 413 S.E.2d 852 (Ct.App. 1992), because Covington is an experienced real estate broker who should have known his account did not contain sufficient funds to cover his down payment check. Covington claims Regions Bank's mortgage is subject to Covington's known equity in the property.

"For an equitable lien to arise, there must be a debt, specific property to which the debt attaches, and an expressed or implied intent that the property serve as security for payment of the debt." *First Fed. Sav. & Loan Ass'n of S.C. v. Finn,* 300 S.C. 228, 231, 387 S.E.2d 253, 254 (1989). An equitable lien is a "mere floating equity until a judgment or decree subjecting the property to the payment of the debt or claim is rendered." *Horry Cnty. v. Ray,* 382 S.C. 76, 83–84, 674 S.E.2d 519, 524 (Ct.App.2009) (internal citation and quotation marks omitted). Even though an equitable lien is not judicially recognized until a judgment is entered declaring its existence, the lien relates back to the time it was created by the conduct of the parties. *Id.* at 84, 674 S.E.2d at 524. Whether an equitable lien exists that would take priority over a mortgage must be considered in conjunction with other well-recognized equitable principles. *Id.* Equitable liens must rest on an express or implied contract; moral obligations do not sustain equitable liens. *Carolina Attractions, Inc. v. Courtney,* 287 S.C. 140, 145, 337 S.E.2d 244, 247 (Ct.App.1985).

One of the cases relied upon by the trial court in awarding an equitable lien, *San–A–Bel*, is factually similar to the matter at hand. In *San–A–Bel*, this court found that purchasers of existing contracts for as yet unconstructed condominium units in a residential development project defeated the mortgage lien priority of the bank because the contracts of sale between the developer and the purchasers existed before the bank made a construction loan. 307 S.C. 76, 79, 413 S.E.2d 852, 854. The court reasoned that the bank had notice of the equitable interest that the purchasers had in the property. *Id.* at 79–80, 413 S.E.2d at 854–55. There are many factual similarities between *San–A–Bel* and this case: the purchasers executed preconstruction sales contracts with the developer; the bank knew about the preconstruction sales contracts at the time it made the construction loan; and neither the sales contracts nor the bank's note and mortgage contained a provision subordinating the purchasers' rights to the rights of the bank. *See id.* at 77–78, 413 S.E.2d at 853–54. The bank in both *San–A–Bel* and in the case at hand required the developer to sell the property before it would make a construction loan. *See id.* at 79, 413 S.E.2d at 854.

There is, however, one very important factual difference between *San–A–Bel* and this case. The purchasers in *San–A–Bel* deposited a cash down payment at the same time as the execution of the contracts for sale. *Id.* at 77, 413 S.E.2d at 853. Covington, on the other hand, executed the contract on September 14, 2006, and then modified the agreement with Wingard on October 20, 2006. Covington delivered a check for his 10% down payment pursuant to the terms of the contract on October 20, 2006. However, for reasons that are not entirely clear, Wingard did not present the check for deposit until November 14, 2006, the day after Regions Bank recorded its mortgage.

Regions Bank claims there is evidence to support a finding that Covington and Wingard colluded to hold the deposit check until there were enough funds in Covington's Bank of America account to cover the check. Regions Bank points to an email from Tom Wingard to Covington dated Wednesday, November 1, 2006, indicating that Bobby Roberson with BB & T (the bank covering Covington's financing for Lot 38) told Wingard the check "should be good by Friday." Regions

Bank interprets these actions, along with Tom Wingard's testimony that he often held checks by request, as evidence that Covington intentionally waited until after Regions Bank recorded its mortgage to fund the account and make his down payment. Given the respective knowledge and positions of the parties at the time Regions Bank acquired its interest, Regions Bank contends the equities tip in its favor because any other result would reward Covington's efforts to "game the system" by tendering his check prior to the closing to help Wingard secure financing, but not putting any funds at risk until after the deal had closed.

In considering whether to award a first priority equitable lien to Covington, we also consider the equities involved. Courts have the inherent power to do all things reasonably necessary to ensure that just results are reached to the fullest extent possible. *Buckley v. Shealy,* 370 S.C. 317, 323–24, 635 S.E.2d 76, 79 (2006) (citing *Ex Parte Dibble,* 279 S.C. 592, 310 S.E.2d 440 (Ct.App.1983)). "For one to have notice of an outstanding equitable interest, [one need not] know the identity of the third party or the extent of his interest. It is sufficient that one either knows or ought to know that some third party interest exists." *San–A–Bel* at 79, 413 S.E.2d at 854. Even though Regions Bank may not have had knowledge that Wingard had not deposited Covington's down payment at the time it gave Wingard a mortgage, Regions Bank was fully aware of Covington's interest in Lot 38. Further, as noted by the trial court, Regions Bank had full knowledge of the amount of Covington's down payment and was not prejudiced by the timing of the deposit of Covington's check. Covington complied with the terms of his purchase agreement and played no role in Wingard's default. Our analysis is not controlled by whether Covington withheld his deposit until after Regions Bank recorded its mortgage because the most important factor in balancing the equities in this matter is Regions Bank's knowledge of Covington's interest. As to this knowledge factor, Regions Bank does not dispute that it: (1) knew Covington entered into a contract for the home and (2) knew the amount of Covington's down payment. If Regions Bank intended for receipt of the down payment by Wingard to be a prerequisite for giving the loan, Regions Bank could have included a contractual provision in

its agreement with Wingard and it did not do so. Moreover, the trial court rejected any finding of collusion. While there is conflicting evidence on this issue, we are not prepared to find that the preponderance of the evidence is contrary to the finding of the trial court.

Courts should also balance other equitable concerns when deciding whether a party is entitled to an equitable lien. Regions Bank claims the trial court erroneously relied on the equitable maxims "equity treats as done that which ought to be done" and "equity looks to substance rather than form." Rather, Regions Bank claims equity should follow the law and reward the party who filed first according to section 30–7–10 of the South Carolina Code (2007). Covington argues the trial court did not rely solely on these maxims and correctly balanced these equitable considerations with the rule set forth in *San–A–Bel.*

As previously indicated, equitable maxims are not binding legal doctrines. Instead, these maxims have evolved over a long period of time from prior cases to assist a court in applying and balancing equitable considerations. The principle "equity regards as done that which ought to be done" applies in cases where the party seeking equitable relief establishes "a clear obligation based upon a valuable consideration that another do some act which he has failed to perform." *Wilkie v. Phila. Life Ins. Co.,* 187 S.C. 382, 393–94, 197 S.E. 375, 380 (1938). The notion "equity looks to substance rather than form" evolved out of judicial regard for that which ought to be done. *Id.* at 393, 197 S.E. at 380. This maxim applies by "dispensing with pure formalities which would otherwise defeat the equity." *Id.; see also Kerr v. City of Columbia,* 232 S.C. 405, 410, 102 S.E.2d 364, 366 (1958) (finding the court must consider the controversy as though town council had issued a business permit, even though the town claimed the area was a residential zone, because town officials told the owner his property was in a commercial zone). When applying this principle, courts look to the substance and intent of the parties, and give a construction consistent with such intent. *Harpending v. Reformed Protestant Dutch Church of City of N.Y.,* 41 U.S. 455, 480, 16 Pet. 455, 10 L.Ed. 1029 (1842). After a party establishes an equitable right, the court may dispense with pure formalities

which would otherwise defeat the equity. *Wilkie,* 187 S.C. at 393, 197 S.E. at 380. A court of equity should scrutinize the conduct of the plaintiff with the utmost care, to ascertain he has done everything which ought to have been done to secure the action requested. *Corbus v. Alaska Treadwell Gold Mining Co.,* 187 U.S. 455, 465, 23 S.Ct. 157, 47 L.Ed. 256 (1903). This maxim has at times guided a court to relieve a party from the consequences of accident, mistake, and fraud. *Camp v. Boyd,* 229 U.S. 530, 559, 33 S.Ct. 785, 57 L.Ed. 1317 (1913). "The rule that equity considers as done that which should be done cannot be invoked to create a right contrary to the agreement of the parties." *Good v. Jarrard,* 93 S.C. 229, 239, 76 S.E. 698, 702 (1912).

■ Utilizing the above equitable principles for guidance, the trial court noted Regions Bank made its loan to Wingard in reliance on the purchase contract and down payment made by Covington. Regions Bank did not know Covington's check had not been deposited by Wingard before it recorded its mortgage. The court also noted that Wingard used Covington's funds in the construction of other homes financed by Regions Bank, such that Regions Bank benefitted from Covington's down payment. We agree with the trial court that Regions Bank was not prejudiced by the timing of the deposit of Covington's check. Therefore, the trial court appropriately looked at substance over form in awarding Covington a first priority equitable lien based on Regions Bank's knowledge of his interest in Lot 38.

■ Regions Bank argues that equity should follow the law and reward the party who filed first. "It is well known that equity follows the law." *Smith v. Barr,* 375 S.C. 157, 164, 650 S.E.2d 486, 490 (Ct.App.2007). Utilizing this maxim, courts have denied equitable relief. *See Morgan v. S.C. Budget & Control Bd.,* 377 S.C. 313, 319–20, 659 S.E.2d 263, 267 (Ct.App.2008). However, where a substantive right exists, an equitable remedy may be fashioned to give effect to that right. *E. Tenn. Natural Gas Co. v. Sage,* 361 F.3d 808, 823 (4th Cir.2004). When providing an equitable remedy, the court may not ignore statutes, rules, and other precedent. *Lonchar v. Thomas,* 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996). "[T]he court's equitable powers must

yield in the face of an unambiguously worded statute." *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298 S.C. 179, 185, 379 S.E.2d 119, 123 (1989); *see also Key Corporate Capital, Inc. v. Cnty. of Beaufort*, 373 S.C. 55, 61, 644 S.E.2d 675, 678 (2007) (finding error in fashioning an equitable remedy).

 The recording statute found in section 30–7–10 of the South Carolina Code provides that all mortgages are valid, without notice, from the day they are recorded in the register of deeds for the county where the real property is located. Deeds are valid as to subsequent purchasers without notice when they are recorded. *Murrells Inlet Corp. v. Ward*, 378 S.C. 225, 232–33, 662 S.E.2d 452, 455 (Ct.App.2008). The purpose of the recording statute is to protect a subsequent buyer without notice. *Frierson v. Watson*, 371 S.C. 60, 67, 636 S.E.2d 872, 875 (Ct.App.2006). In the common law and in equity, a purchase money mortgage will ordinarily be given priority over other security instruments in realty. *Citizens & S. Nat'l Bank of S.C. v. Smith*, 277 S.C. 162, 164, 284 S.E.2d 770, 771 (1981). However, if the mortgage holder has notice of a prior purchase money mortgage, then it cannot prevail under the recording statute by virtue of filing first. *Crystal Ice Co. of Columbia, Inc. v. First Colonial Corp.*, 273 S.C. 306, 308, 257 S.E.2d 496, 497 (1979).

 Here, Covington's equitable interest is not defeated by Regions Bank's mortgage because Covington entered into his purchase contract before Regions Bank filed its mortgage with the register of deeds and Regions Bank was aware of this interest. *See* S.C.Code Ann. § 30–7–10 ("[A]ll mortgages . . . are valid so as to affect the rights of subsequent creditors (whether lien creditors or simple contract creditors), or purchasers for valuable consideration without notice . . . ."). The intervention of equity does not impugn the integrity of the recording statute in this case. *See Crystal Ice Co.*, 273 S.C. at 308, 257 S.E.2d at 497 (finding a first-to-file mortgage holder not entitled to the protection of the recording statute where that mortgage holder had knowledge of the existence of a prior purchase money mortgage). The trial court was presented with the question of whether equity should intervene only as between Regions Bank and Covington, not any other

person or creditor potentially impacted by the recording statute. The trial court appropriately looked at the substance of the issue, namely Regions Bank's knowledge of Covington's prior interest, over Covington's failure to ensure that his down payment was received by Wingard prior to closing. In fact, Regions Bank would not have given Wingard a construction loan if Wingard had not already sold the lot to a purchaser. Therefore, just as equity was allowed to intervene in *San–A–Bel* and *Crystal Ice,* we conclude the record herein supports the trial court's award to Covington of priority on his equitable lien over Regions Bank's mortgage.

 We next turn to the trial court's consideration of the possibility of forfeiture by Covington. Regions Bank argues the trial court erred in finding Covington would forfeit his deposit if not given a first priority equitable lien because Covington would still be able to assert a claim against Wingard to recover his $276,700 deposit. Covington asserts the trial court properly applied the equitable principle that equity disfavors a forfeiture.

 "A court of equity abhors forfeitures, and will not lend its aid to enforce them." *Jones v. N.Y. Guar. & Indem. Co.,* 101 U.S. 622, 628, 25 L.Ed. 1030 (1879). "Equity does not favor forfeitures or penalties and will relieve against them when practicable in the interest of justice." *Lane v. N.Y. Life Ins. Co.,* 147 S.C. 333, 374, 145 S.E. 196, 209 (1928). The court has the power in equity to deny or delay forfeiture when fairness demands. *Lewis v. Premium Inv. Corp.,* 351 S.C. 167, 172, 568 S.E.2d 361, 364 (2002). In *Lewis,* the court found it would be inequitable to enforce the forfeiture provision without first allowing the purchaser an opportunity to redeem the contract by paying the entire purchase price. *Id.* The court looked at case-specific factors in making this determination, specifically the amount of equity the purchaser had accumulated, the length and number of defaults, the amount of forfeiture, the speed in which equity was sought, and the amount of money the purchaser would forfeit in relation to the purchase price of the property. *Id.*

 Covington also claims Regions Bank will be unjustly enriched if the bank's mortgage is given priority over Covington's $276,700 equitable lien. Unjust enrichment is an

equitable doctrine, which permits recovery of the amount that the defendant has been unjustly enriched at the expense of the plaintiff. *Dema v. Tenet Physician Servs.–Hilton Head, Inc.,* 383 S.C. 115, 123, 678 S.E.2d 430, 434 (2009); *Ellis v. Smith Grading & Paving, Inc.,* 294 S.C. 470, 474, 366 S.E.2d 12, 15 (Ct.App.1988). The elements to recover for unjust enrichment based on quantum meruit, quasi-contract, or implied by law contract, which are equivalent terms for equitable relief, are: "(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach,* 341 S.C. 1, 8–9, 532 S.E.2d 868, 872 (2000).

The trial court did not expressly find that Regions Bank would be unjustly enriched or that Covington had suffered a forfeiture as a certainty; rather, the trial court found a substantial likelihood of forfeiture and noted the equitable considerations in *Elliott v. Snyder,* 246 S.C. 186, 143 S.E.2d 374 (1965), were identical to those presented in the present matter.[3] In *Elliott,* the seller sought rescission and cancellation of a contract for the sale of land. *Id.* at 189, 143 S.E.2d at 375. Pursuant to the contract, the purchaser was required to make annual installment payments. *Id.* The purchaser's check dated December 31st was returned to the seller marked "drawn against uncollected funds." *Id.* at 190, 143 S.E.2d at 375. The check was presented for deposit on January 4th, one day after the purchaser had deposited sufficient funds to cover the check on January 3rd; however, the purchaser's bank did not release the funds until January 9th. *Id.* Although the contract provided that the property would revert to the seller without recourse in the event of default, the court found the purchaser substantially complied with the contract. *Id.* at 191, 143 S.E.2d at 376. In doing so, the court declined to rescind the contract and noted "[f]orfeitures are not favored in

---

3. In light of our disposition herein, we decline to address whether unjust enrichment may serve as an additional sustaining ground. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address remaining issues where disposition of prior issues was dispositive).

law and [c]ourts will seize upon even slight evidence to pre-
vent one . . . ." *Id.* at 191, 143 S.E.2d at 375–76.

In its order denying Regions Bank's motion to alter or
amend, the trial court clarified:

Although the Court's Order notes that there is a substantial
likelihood that Covington will forfeit $276,700.00 of his in-
vestment if the Court does not rule in his favor, the Court's
decision does not rest on a finding that Covington will in
fact forfeit $276,700 of his investment. There is no need for
the Court to make a finding that forfeiture is certain to
result in order to rule in favor of Covington, as the Court's
Order does not rest entirely upon the holding in *Elliott.*
Nonetheless, it is inescapable that in the current economic
climate, with a partially constructed home, there is a sub-
stantial likelihood that Covington will forfeit some or all of
his $276,700.00 investment, and there is ample evidence that
a risk of forfeiture exists.

Regions Bank advanced over $1 million to Wingard towards
the purchase of and construction on Lot 38.[4] As the trial
court noted, there was a substantial likelihood that the lot,
which Wingard purchased for $965,000, would sell for an
amount less than Covington's first priority $10,000 lien and
Regions Bank's mortgage lien. The trial court concluded it
need not decide this case based solely on whether or not
Covington was "certain" to suffer a forfeiture. Instead, the
trial court properly considered the substantial likelihood of
forfeiture in balancing the equities to find Covington was
entitled to a first priority equitable lien. We also note Re-
gions Bank has already obtained a judgment, including inter-
est, against Wingard, Tom Wingard, and Deborah Wingard;
however, Regions Bank voluntarily waived its right to a
deficiency judgment against Tom and Deborah Wingard but
maintained its right to obtain a deficiency against Wingard,
the corporate entity. In reviewing the record de novo, we find
Regions Bank has not carried its burden of convincing us that
the trial court committed error in its findings regarding this

4. As of the date of trial, the principal balance owed by Wingard to
 Regions Bank was $1,866,664.92. With interest and fees, Regions
 Bank claimed Wingard owed $2,082,859.85.

forfeiture issue. *See Lewis v. Lewis*, 392 S.C. 381, 388–89, 709 S.E.2d 650, 653–54 (2011) (applying de novo review).

As an additional sustaining ground, Covington claims Regions Bank, as a plaintiff coming to court seeking relief in equity, must also do equity in order that justice might be done between the parties. Regions Bank knew Covington had made a down payment under his purchase contract at the time it filed its foreclosure action and does not dispute Covington's $10,000 first priority equitable lien. Despite this knowledge, Regions Bank failed to name Covington as a defendant in the foreclosure action, forcing Covington to intervene. Covington claims Regions Bank sought a windfall by failing to name Covington in the lawsuit, even though it was aware of Covington's interest.

This equitable maxim is commonly phrased as "[h]e who seeks equity must do equity." *Provident Life & Accident Ins. Co. v. Driver*, 317 S.C. 471, 479, 451 S.E.2d 924, 929 (1994). This principle applies to one who affirmatively seeks equitable relief. *City of Columbus v. Mercantile Trust & Deposit Co.*, 218 U.S. 645, 662, 31 S.Ct. 105, 54 L.Ed. 1193 (1910). In order for justice to be done between parties, a party is required to do equity when asking the court to invoke the aid of equity. *See Ingram v. Kasey's Assocs.*, 340 S.C. 98, 107, 531 S.E.2d 287, 291 (2000) (declining to grant a plaintiff's request for specific performance where the plaintiff misled the defendants); *Anderson v. Marion*, 274 S.C. 40, 43, 260 S.E.2d 715, 716 (1979) (finding defendants who sought equity against the plaintiffs for specific performance were required to do equity and pay plaintiffs money they asserted they were willing and able to pay); *Shumaker v. Shumaker*, 234 S.C. 421, 427, 108 S.E.2d 682, 686 (1959) ("Plaintiffs who come into Court invoking the aid of equity should be required to do equity in order that justice might be done between the parties."); *Anderson v. Purvis*, 211 S.C. 255, 266, 44 S.E.2d 611, 616 (1947) (discussing the maxim that he who seeks equity should do equity).

Although Covington makes a compelling argument that Regions Bank's failure to name him in the foreclosure action suggests Regions Bank attempted to circumvent Covington's interest, Covington cannot show he was prejudiced because he

was able to intervene and has participated fully in the lawsuit. Because the decision of whether to prevent Regions Bank from seeking equitable relief is discretionary, and Covington was allowed to join the lawsuit without prejudice to his claim, we decline to affirm based on this additional sustaining ground.

Regions Bank also argues the trial court erred in ruling that the payment of a check relates back to the date it was delivered. Regions Bank asks the court to undertake a factually intensive analysis, as did the court in *San–A–Bel*, to determine that it would be inequitable to credit Covington with having paid the check on the date of delivery. Covington argues that it is well-settled in other jurisdictions that payment of a check, when honored upon presentment, relates back to the date the check is delivered to the payee. After considering the equities at play in this matter, we find the trial court properly concluded Covington is entitled to a first priority equitable lien based on Regions Bank's knowledge of Covington's interest in Lot 38. Thus, we need not decide whether Covington's check relates back to the date of delivery or should be considered paid upon delivery.

■ Finally, Regions Bank also argues it should have priority over Covington's equitable lien because the future advances made to Wingard relate back to the date of the mortgage pursuant to section 29-3-50(A) of the South Carolina Code (2007). Initially, we note this issue was not raised to or ruled upon by the trial court. *See S.C. Dep't of Transp. v. Horry Cnty.*, 391 S.C. 76, 82–83, 705 S.E.2d 21, 25 (2011) (finding an issue must be raised to and ruled upon by the trial court in order to be preserved for appellate review). Nonetheless, even if the advances made by Regions Bank after Covington's check was deposited relate back to the date of the mortgage, Covington's equitable lien is still entitled to priority because of Regions Bank's knowledge of Covington's interest.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is hereby

**AFFIRMED.**

HUFF and SHORT, JJ., concur.