## 21013

J. J. WHITMIRE, as Trustee and Member of the Joanna Revival Center, Inc., Appellant, v. Vinson ADAMS, Dan Gunter, Sr., and W. F. Boisky, as Trustees of the Joanna Assembly of God of Joanna, South Carolina, Respondents.

(257 S. E. (2d) 160)

*Thomas H. Pope, III,* of *Pope & Schumpert,* Newberry, *for appellant.*

*Thomas A. Babb,* of *Babb & Babb,* Laurens, *for respondents.*

July 26, 1979.

RHODES, Justice:

This class action is brought for the rescission of certain deeds from the Trustees of the Joanna Revival Center, an eleemosynary corporation chartered for religious purposes by the State of South Carolina, to the Trustees of the Joanna Assembly of God. The basis asserted for the action is that the conveyances were obtained by fraudulent representations and that the Joanna Assembly of God, therefore, holds title to the property as constructive trustee for the Joanna Revival Center. The answer of the defendants admitted that these properties were conveyed, but generally denied the remaining allegations. The defendants further entered a counterclaim asserting that the name "Joanna Revival Center" was the property of the defendants. The matter was heard by a Special Referee, who found against all relief sought by the plaintiff-appellant. The order of the Circuit Judge con-

firmed the Report of the Special Referee, from which order this appeal is taken. We affirm.

The Joanna Revival Center was organized in 1957 by 67 former members of the Pentacostal Holiness Church, who were dissatisfied with the absence of local church autonomy in that organization. The group conducted services in an abandoned theater for the first eighteen months. Although the church in its beginning was not affiliated with any denomination, the first pastor of the congregation became affiliated with the Assemblies of God in 1958 and retained such status during the remainder of the period of his pastorate, which terminated in 1965. Religious literature published by the General Council of the Assemblies of God was used in the various church programs even before the affiliation with that body. Through the contributions of members and a ten-year bank loan, which was co-signed by several charter members including the pastor, a church sanctuary was completed in 1958. In due time, the bank loan was paid off by contributions from the congregation. It is this property that is the subject of the present dispute.

In 1961 the congregation voted to affiliate with the General Council of the Assemblies of God. The church minutes reflect the passage of the motion with the notation that the group could keep its charter (Joanna Revival Center) and that if they became dissastisfied with the Assemblies of God, they could "go back as Joanna Revival Center." Although the charter of Joanna Revival Center remained displayed in the church vestibule until 1966, the sign on the outside of the church was changed to "Joanna Assembly of God" immediately after the vote in 1961, and this is the name under which the church continues to operate.

In 1966 the congregation, by a vote of 24 to 6, authorized the transfer of title to the church's real estate from the Trustees of Joanna Revival Center to the Trustees of Joanna Assembly of God. This action was later consummated by properly executed and recorded deeds of conveyance. The deeds

reflect that the trustees conveying the property from the Joanna Revival Center are the same individuals receiving the property as Trustees of Joanna Assembly of God. The resolution accompanying the deed recites the 1961 change of name of the church, its affilation with the General Council of the Assemblies of God, and the desire to have title to the property be made consistent with such prior action. There is testimony to the effect that the District Superintendent of the Assemblies of God and the local minister told the congregation at the time this vote was taken that the church real estate was being held "illegally" by the Trustees of Joanna Revival Center.

At the time this vote was taken, August 26, 1966, the rules originally adopted by the Joanna Revival Center were in force, and the appellant has taken issue with the failure to literally comply with Rule 9 thereof, which provides that any decision of the church "shall be determined by a majority of those who support the church." The record indicates that no inquiry was made of the membership prior to the vote as to whether they "support[ed] the church." The term "support the church" is susceptible of a host of interpretations. Does it mean financial support, doctrinal support, or support of the church through attendance? If it means any one or all of these, to what degree must such support be forthcoming in order to qualify a member to vote? While there are objective aspects to supporting the church, these are secondary to the theological aspects. Answers to these questions obviously involve inquiring into ecclesiastical matters, which our court has consistently declined to do. The case of *Morris Street Baptist Church v. Dart,* 67 S. C. 338, 45 S. E. 753 (1903) was concerned with whether or not a minister had been discharged. A key issue was the propriety of a vote to discharge him. The Court stated:

Neither will the court, as a civil tribunal, undertake to determine whether the resolution . . . was passed in accordance with the canon law of the church, except in so far as

may be necessary to do so in determining whether it was in fact the church that acted.

*Id.* 45 S. E. at 754.

It is undisputed that all who voted were members of the church and that there was no objection by any of the congregation to the voting procedure. We find the vote in question represented the proper will of the congregation, and that there is no merit in this exception.

In support of his claim to a constructive trust, the appellant alleges fraud, both actual and constructive, against the respondents, and wrongful conduct in the following particulars:

(1) the statements to the congregation by the District Superintendent and local pastor that the church property was being held "illegally" by the Joanna Revival Center;

(2) the failure to abide by the Joanna Revival Center rules in conducting the vote to transfer the property;

(3) the representation in 1961, when the Joanna Revival Center affiliated with the Church of God, that the property would continue in the Center's name.

A constructive trust is distinguished from an express trust in that the former arises entirely by operation of law without reference to any actual or supposed intention of creating a trust. It is resorted to by equity to vindicate right and justice or frustrate fraud. *All v. Prillaman,* 200 S. C. 279, 20 S. E. (2d) 741 (1942). Generally, fraud is an essential element, but it need not be actual fraud. The case of *Bank of Williston v. Alderman,* 106 S. C. 386, 91 S. E. 296, 298 (1917) states: "Actual fraud is not necessary, but such trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title." *See also Dominick v. Rhodes,* 202 S. C. 139, 24 S. E. (2d) 168 (1943).

As evidenced by the above summary, equity is less than demanding and quite flexible in prescribing the elements essential to a constructive trust. Further, a constructive trust is permitted to be proved by parol evidence despite the statute of frauds. *Wolfe v. Wolfe,* 215 S. C. 530 56 S. E. (2d) 343 (1949). However, this liberality is counterbalanced by the rigid standard of proof which equity decrees as a prerequisite to the establishment of a constructive trust. The following applicable principles of law were quoted with approval by Justice Stukes in *All v. Prillaman, supra:*

"It has frequently been laid down as an established rule that a mere preponderance of the evidence is not sufficient to prove a constructive trust, but that it must be established by evidence which is clear, definite, unequivocal, and satisfactory, or such, as has been said, as to lead to but one conclusion, or as to leave no reasonable doubt as to the existence of the trust; and where the evidence is not of such character, or, *a fortiori,* where it raises grave doubts as to the existence of a trust or of any element essential to its creation, a decree is properly entered against the person seeking to establish the trust. Positive and uncontradicted testimony of the existence of facts sufficient to give rise to a constructive trust need not necessarily be adopted as true by the trial Judge, if he is not convinced thereby; and testimony given long after the transaction in question, and after the parties concerned are dead, although positive and not contradicted by other testimony, is to be regarded with serious misgivings."

*Id.* 20 S. E. (2d) at 750, *quoting* 65 C. J. 493, 494.

Let us examine the evidence in this case to determine whether it is sufficient to meet the high standard of proof necessary to the creation of a constructive trust.

Assuming that the authorities of the Assemblies of God did promise in 1961 that the affiliation with it could be cancelled and the church revert to its former status as the Jo-

anna Revival Center, it is clear that such promise has not been breached in that the membership still retains that authority today. As a matter of fact, this identical question was placed before the congregation for a vote in 1969 and the majority voted it down, only seven or eight members voting for the motion to revert to its former status.

The claim of misconduct based on alleged breach of an oral promise that the church property would continue in the Center's name is likewise without merit in that the congregation, by an action we have already held to be proper, voted to make the transfer of title. The congregation unquestionably has the authority to change title to its property if it is accomplished in conformity with its applicable rules. The statement attributed to the District Superintendent and the local pastor at the time of the vote to the effect that the former Trustees were holding the property "illegally" is insufficient as the basis for creating a constructive trust. To a layman, the fact that the church was operating in one name and holding the property in another might well be considered as "illegal". In any event, under the circumstances in which it was made, such a statement can not be properly considered as supplying the clear evidence of fraud or misconduct upon which a constructive trust must be premised. It must be borne in mind that these alleged oral statements were made approximately elven years prior to the hearing before the Special Referee, and due to this lapse of time are to be "regarded with serious misgivings." *See All v. Prillaman, supra.* It is to be further noted that the plaintiff-appellant was secretary-treasurer of the church from its inception in 1957 until after the church property was conveyed, and that as such he signed both the application to affiliate with the Assemblies of God in 1961 and the resolution passed by the congregation to convey the church property. The appellant was fully informed of the business of the church and there is no evidence of surreptitious activity on the part of the defendants or others on their behalf.

The appellant contends the local church has lost its autonomy by reason of the series of events herein recited. This claim is refuted by the record. The Joanna Church of God in its affiliation with the General Council is denominated a "Sovereign" church and is required to submit to no control from higher authority. The officials of the Assemblies of God specifically renounce any claim to the local church property. As the Special Referee found: "It appears to my satisfaction that by a majority vote the congregation can today discharge a minister; call a minister; change the name of the church . . . and do all other things it did and could have done as the Joanna Revival Center." The Assemblies of God do not and cannot require financial support from a local sovereign church.

The local congregation adopted in 1966 a constitution and by-laws, Article VI, Section 4 of the latter providing that, if it ever ceased to function as a church body, the property of the church would revert to the General Council of the Assemblies of God. The trust deeds in question do not contain such a provision. We deem this provision of no controlling significance in that under Article VIII of the by-laws, a simple majority of the local congregation can change or delete this provision.

The Special Referee and Circuit Judge have concurred in the finding that the evidence does not measure up to that clear, definite, and convincing proof required in the establishment of a constructive trust. We confirm such finding.

While the plaintiff-appellant's amended complaint is predicated on the alleged existence of a constructive trust by reason of fraud and misconduct, he further argues in his brief the theory that those for whom he brings this action are "loyalists" of the original group and are therefore entitled to the property under the line of cases typified by *Bramlett v. Young*, 229 S. C. 519, 93 S. E. (2d) 873 (1956). This discussion in both briefs was apparently in-

duced by the statement in the Referee's Report to the effect that this line of cases did not apply because the Joanna Revival Center is a congregational rather than a connectional church. Assuming, without deciding, that the *Bramlett* line of cases applies to independent religious sects as well as connectional churches, we do not feel that there is proof, for the reasons set forth above, of a sufficient variance from the original objectives of the Joanna Revival Center to call into application the principles of *Bramlett*.

Finally, the appellant excepts to the lower court's ruling that the name and charter of "Joanna Revival Center" is the property of the congregation represented by the defendants. This ruling is consistent with the views which we have hereinabove expressed. The present congregation had its genesis in the Joanna Revival Center, but has been an active and expanding body since that time. It is significant that the appellant was continuing to worship at this church at the time of the hearing before the Special Referee. No separate rolls have ever been kept segregating the original charter members from those who later joined the church, and no distinction ever made as between them. Although there have obviously been disagreements among the members, it is apparent from the record that the church has been a substantially unified and continuing body since its inception. We find no merit in this exception.

Affirmed.

LEWIS, C. J., and LITTLEJOHN, NESS and GREGORY, JJ., concur.